UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____               │
│ DATE FILED: December 3l, 2014        │
└─────────────────────────────────────┘
```

UNITED STATES OF AMERICA

— v.—

DONALD CUSHNIE,

Defendant.

**MEMORANDUM
OPINION & ORDER**

14 Cr. 119 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Donald Cushnie is charged with failing to register as a sex offender, in violation of 18 U.S.C. § 2250.  (Indictment (Dkt. No. 6))  Cushnie has moved to suppress his post-arrest statements and evidence obtained from his apartment at the time of his arrest.  For the reasons stated below, Cushnie's motion will be denied in its entirety.

## BACKGROUND

### I.      THE CUSHNIE AND MANAGO DECLARATIONS

In support of his motion to suppress, Cushnie submitted his own declaration and that of his wife, Lisa Manago.  Together, their declarations set forth the following version of events:  On October 3, 2013, Cushnie and Manago were residing at Apartment 6J, 259 West 144th Street in Manhattan.  (Cushnie Decl. (Dkt. No. 15) ¶ 3; Manago Decl. (Dkt. No. 22) ¶ 2) When law enforcement officers knocked on the couple's door Manago opened it, and "the officers proceeded to let themselves into the apartment."  (Manago Decl. (Dkt. No. 22) ¶ 3)  The officers did not seek or obtain consent to search the apartment from either Manago or Cushnie. (Id.; Cushnie Decl. (Dkt. No. 15) ¶ 6)

After entering the apartment, officers ordered Manago and her three children out of the apartment.  (Manago Decl. (Dkt. No. 22) ¶ 4; Cushnie Decl. (Dkt. No. 15) ¶ 4)  Three

officers accompanied Manago and her children into the hallway, while four others remained in the apartment. (Manago Decl. (Dkt. No. 22) ¶ 6) Manago and her children sat in the hallway for approximately forty minutes. (Id. ¶ 5) During that time, an officer came out of the apartment and asked Manago to sign a consent to search form. (Id. ¶¶ 7-8) Manago refused. (Id. ¶ 8) Officers later led Manago and her children back into the apartment and proceeded to "rummage[ ] through boxes of [her] personal property." (Id. ¶ 9-10) Manago refused to answer the officers' questions about the property. (Id. ¶¶ 11-12)

While in the apartment, officers seized Cushnie's cell phone, wallet, and a set of car keys. (Cushnie Decl. (Dkt. No. 15) ¶ 5) Cushnie was arrested and then interrogated. (Id. ¶ 7) Cushnie denies waiving his <u>Miranda</u> rights, "as evidence[d] by [his] refusal to sign the Miranda waiver [form]." (Id. ¶ 8)

## II.    <u>SUPPRESSION HEARING TESTIMONY</u>

On July 1, 2014, the Court conducted an evidentiary hearing concerning Cushnie's suppression motion. The Government called Senior Inspector Nicholas Ricigliano of the United States Marshals Service's ("USMS") New York/New Jersey Regional Fugitive Task Force, and Senior Inspector Michael Romani of the USMS's Sex Offender Investigations Branch. The Defendant and his wife also testified. The evidence offered at the hearing included the following:

In June 2013, an arrest warrant was issued in this District for the Defendant's arrest based on his alleged violation of the terms and conditions of his supervised release. (Suppression Hearing Transcript ("Hearing Tr.") (Dkt. No. 31) at 7, 34-35) On October 3, 2013,

with the help of a GPS tracking warrant,[1] the USMS determined that Cushnie was in Manhattan at Apartment 6J, 259 West 144th Street, which is a six-floor, multi-unit building.  (Id. at 8-9)  At about 6:00 a.m., approximately seven law enforcement officers gathered in the hallway outside Apartment 6J to execute the arrest warrant.  (Id. at 9-10, 37)  Senior Inspectors Ricigliano and Romani were both present.  (Id. at 9, 17)

Ricigliano testified that he knocked on the door – softly at first – "to try to generate some movement in the apartment."  (Id. at 10)  After receiving no response, he "knocked loudly and announced that it was the police with a warrant."  (Id.)  Manago testified that she "was woken up by a bang at the door."  (Id. at 65)  She further testified that one of the officers screamed:  "Open the fucking door.  Open the fucking door.  Open the fucking door now.  Now open the fucking door."  (Id.)

Manago – who testified that she was "scared" – opened the door.  (Id.)  The officers were holding guns (including pistols and a rifle), a ballistic shield, and a metal device for opening doors that made a noise as it pressed against the door.  (Id. at 13, 37-38, 65)  Manago testified that the officers "told [her] to get the hell out of [her] house and get in the hallway."  (Id. at 65)  Manago, her two daughters, and her niece then went into the hallway outside the apartment, where they remained for "almost up to an hour."  (Id. at 13, 40, 66)

Upon entering the apartment, the marshals encountered Cushnie in the living room.  (Id. at 14)  He was wearing a "[t]-shirt" and "boxer shorts."  (Id. at 15)  The marshals instructed Cushnie to get on the ground, and he complied.  (Id. at 15, 39)  He was then handcuffed.  (Id. at 15, 40)  According to Ricigliano, after Cushnie was handcuffed, "[w]e

---

[1] Cushnie previously moved to suppress the fruits of the GPS tracking warrant on the ground that it was issued without probable cause.  (Notice of Motion (Dkt. No. 13) ¶ 1)  That motion was denied at the outset of the July 1, 2014 suppression hearing, for reasons explained on the record at that time.  (Hearing Tr. (Dkt. No. 31) 3-4)

proceeded past Mr. Cushnie.  We left the one or two deputies with Mr. Cushnie, proceeded past Mr. Cushnie to continue on with our protective sweep of the apartment to make sure there was nobody else in there."  (Id. at 15)  Ricigliano observed a wallet, car keys, and a cell phone in Cushnie's immediate vicinity (approximately two or three feet away from him).  (Id. at 15-16, 28)  Ricigliano picked up these items "[o]nce we finished with our protective sweep."  (Id. at 28)  These items were thus seized after Cushnie was handcuffed and before officers asked Manago for her consent to search the apartment.  (Id. at 28, 42-43)

      Ricigliano testified that he read Miranda warnings to Cushnie from a printed form (Gov't Ex. 1) after the protective sweep.  (Id. at 15-16)  Ricigliano read the form verbatim and in a "normal" tone of voice, with his weapon holstered.  (Id. at 17)  Cushnie was seated on the floor and was "calm [and] composed" when Ricigliano read the form to him.  (Id. at 18, 47)  Inspector Romani testified that Ricigliano's tone was "[p]urely conversational."  (Id. at 58)

      Romani and Ricigliano both testified that after Ricigliano read the Miranda warnings, he then read the following language from the form:  "I have read this statement of my rights, and I understand what my rights are."  Cushnie responded, "Yeah" and nodded.  (Id. at 18, 43, 53)  Ricigliano testified that he next asked Cushnie, "Do you understand your rights?"  Cushnie replied, "Yeah" and nodded.  (Id. at 44)  Ricigliano then asked Cushnie to sign the signature line immediately below that text, but Cushnie said that he would not sign anything.  (Id. at 18, 44, 53)  Ricigliano then asked, "But you do understand you don't have to talk to us?"  Cushnie replied "Yeah" and nodded.  (Id. at 18, 45)[2]

      Ricigliano next read the form's text below the heading "Waiver of Rights":

---

[2]  Handwriting next to the signature line reads:  "Refused to sign but did acknowledge that he understood his rights."  (Gov't Ex. 1)  Neither side elicited testimony concerning this handwriting.  Accordingly, it is not clear who wrote it and when it was written.

> I have read the above statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

(Id. at 18; Gov't Ex. 1) Cushnie again replied, "Yeah" and nodded. (Hearing Tr. (Dkt. No. 31) at 19) When Ricigliano asked Cushnie to sign on the signature line under the "Waiver of Rights" heading, Cushnie again told Ricigliano that he would not sign.[3] (Hearing Tr. (Dkt. No. 31) at 19, 44-45) Romani testified that Cushnie was "attentive" and "actively listening to" Ricigliano during this exchange. (Hearing Tr. (Dkt. No. 31) at 58) According to Ricigliano, one or two minutes later he asked Cushnie whether the cell phone the marshals had recovered belonged to him. Cushnie said "no." (Id. at 19)

Ricigliano asked Cushnie additional questions "about two hours" later in the cell block at 500 Pearl Street in lower Manhattan. (Id. at 19, 45-46) Ricigliano did not administer Miranda warnings at this time. (Id. at 46) Ricigliano testified that Cushnie never stated that he did not want to answer questions or that he wanted to speak with a lawyer. (Id. at 19-20) Although the Complaint indicates that Cushnie made several incriminating statements during questioning at 500 Pearl Street, neither side elicited testimony at the suppression hearing concerning the content of those statements.[4]

Cushnie testified that he does not recall ever receiving Miranda warnings on October 3, 2013, the day of his arrest. (Id. at 87, 93, 96) He explained that he is familiar with

---

[3] Handwriting next to this signature line reads: "Refused to sign but did acknowledge that he did not have to speak to us." (Gov't Ex. 1) Once again, neither side elicited testimony concerning this handwritten notation.

[4] According to the Complaint, Cushnie stated that: (1) he lived in New Jersey and had been staying with a friend in Flint, Michigan; (2) he had left the Southern District of New York because authorities in New Jersey were trying to send him to jail; and (3) he did not register as a sex offender in Michigan because he was "on the run." (Gov't Br. Ex. A (Cmplt.) (Dkt. No. 18), ¶ 11(d)(i)-(iii))

Miranda warnings, having been read Miranda warnings on "several" occasions before October 3, 2013. (Id. at 87-88, 93-94) Cushnie further testified that he never told any law enforcement officers on October 3, 2013, that he was waiving his Miranda rights. (Id. at 88)

Ricigliano testified that "a minute or two after [he] gave [Cushnie] the Miranda warning[s]," Cushnie got dressed. (Id. at 20) A marshal handed Cushnie a pair of jeans to wear. The jeans had been laying on a bed in the living room. (Id.) Before giving the jeans to Cushnie, the marshal searched the pockets and discovered "dozens of what [officers] believed to be Oxycontin pills." (Id.)

After this discovery, Romani told Manago – who was still in the hallway – that drugs had been found in Cushnie's pants. (Id. at 54) Romani testified that he "asked Ms. Manago if she would be willing to consent for us to conduct a search of the apartment in regards to additional narcotics." (Id. at 54, 61-62, 21) Romani's weapon was holstered at the time, as were those of other officers. (Id. at 56) He testified that she replied: "You can search, you're not going to find anything, and if you do, it's not mine." (Id. at 54, 61-63) According to both Romani and Ricigliano, Romani then produced a consent to search form, read the form "verbatim" to Manago, showed her the form, and asked her – in a "normal conversational" tone – to sign it. (Id. at 23-24, 54-55) Romani testified that she replied, "You can search my apartment, but I'm not signing anything." (Id. at 56) Ricigliano offered a similar account: "She said, 'I'm not signing anything . . . You can search all you want, you're not going to find anything.' And I believe [Romani] asked her again if she would sign the form, and she said, 'You ain't going to find anything, but you can look.'" (Id. at 24) Ricigliano and Romani testified that Manago appeared "agitated" and "confrontational to some extent" during this exchange. (Id. at 47, 56) Romani wrote the following statement on the consent to search form:

6

"Verbal consent granted, refused to sign form.  Witnessed by [Senior Inspector] Romani, [Deputy United States Marshal] Grogan, [Senior Inspector] Ricigliano."  (Id. at 23-24; Gov't Ex. 2)

Ricigliano testified that Manago was present while officers searched the apartment and never asked the marshals to stop searching.  (Id. at 25)  Ricigliano further testified that – during Cushnie's 2011 arrest – Manago had refused to sign papers acknowledging that she had taken custody of Cushnie's property.  (Id. at 7, 29, 33)

Manago testified that she never gave anyone authority to search her apartment. (Id. at 67)  She further testified that, although Romani showed her a form, he "didn't read a form to me.  He told me this is a form for me to sign to give – for consent for them to come in my house and search my house."  (Id. at 84-85)  She added that:  "He said that if I don't cooperate with them, that they're going to – whatever they find in my house, they're going to lock me up . . . with my husband."  (Id. at 85)

The marshals' search of the apartment yielded "an unmarked bag with several hundred pills that [they] believed were some form of muscle relaxer."[5]  (Id. at 28-29)  Cushnie – who was in the apartment when the officers began their search – did not object to the search.  (Id. at 25)

---

[5] Cushnie has not been charged with a narcotics offense, but the Government has indicated that it may seek to introduce the drug evidence at trial.  (Gov't. Ltr. Dec. 17, 2014 (Dkt. No. 38))

## DISCUSSION

### I.    CUSHNIE'S SUPPRESSION MOTION

Cushnie has moved to suppress:  (1) his post-arrest statements; and (2) all evidence obtained from inside Apartment 6J, including the cell phone, car keys, wallet, and drugs.  (Dkt. No. 13)

### II.   POST-ARREST STATEMENTS

#### A.    Legal Standard:  Miranda Requirements

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that

> when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning . . . [the following] [p]rocedural safeguards must be employed to protect the privilege [against self-incrimination:] . . . He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

Id. at 478-79.

"To prove a valid waiver [of Miranda rights], the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam).  "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'"  United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

"The government bears the burden of demonstrating by a preponderance of the evidence that a defendant waived his constitutional rights." United States v. Lynch, 92 F.3d 62, 65 (2d Cir. 1996).

It is well established, however, that a suspect's refusal to sign a Miranda waiver form, "however unequivocal, is not itself necessarily sufficient to establish an unambiguous invocation [of Miranda rights]." United States v. Plugh, 648 F.3d 118, 128 (2d Cir. 2011).  For example, in Berghuis v. Thompkins, 560 U.S. 370 (2010), the defendant refused to sign a Miranda waiver form after having been read Miranda warnings. Berghuis, 560 U.S. at 375.  The Court nonetheless concluded that the defendant had not invoked his rights, stating that "[t]here is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously." Id. at 381.

Similarly, in Plugh, 648 F.3d 118, the Second Circuit found no invocation of rights where the defendant had refused to sign a waiver form and had made equivocal statements to officers, such as "I am not sure if I should be talking to you," and "I don't know if I need a lawyer." Plugh, 648 F.3d at 121, 125-26.  The Plugh court explained that, in light of Berghuis, the critical issue is whether a defendant has "unambiguously invoke[d] his right to remain silent or to speak with an attorney":

> Critically, at no point did [the defendant] unambiguously inform the custodial officers that he wished to invoke his right to remain silent or his right to speak with an attorney, nor was his course of conduct such that the officers should reasonably have been put on notice that . . . no further questioning could occur.

Id. at 126-27.  Accordingly, the suspect's refusal to sign the form did not constitute an unequivocal invocation of his Miranda rights.

"'Even absent the accused's invocation of [his Miranda rights], the accused's statement during a custodial interrogation is inadmissible at trial[, of course,] unless the

prosecution can establish that the accused in fact knowingly and voluntarily waived [Miranda] rights when making the statement.'" Id. at 127 (quoting Berghuis, 560 U.S. at 382). "The waiver inquiry, itself, has two 'distinct' components." Id. First, the waiver must be "knowing," which means that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. (quoting Moran, 475 U.S. at 421). Second, the waiver must be voluntary. "A voluntary relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate choice rather than intimidation, coercion, or deception.'" Male Juvenile, 121 F.3d at 41 (quoting Moran, 475 U.S. at 421). Voluntariness is evaluated in light of "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials" to determine whether "the defendant's will was overborne by the [police officers'] conduct." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991); see Lynch, 92 F.3d at 65 (applying this analysis to determine "[w]hether a defendant knowingly and voluntarily waived his rights"). "Coercive police activity is 'a necessary predicate' to finding that a waiver of Miranda rights was not voluntary." Coronado v. Lefevre, 748 F. Supp. 131, 139 (S.D.N.Y. 1990) (quoting Colorado v. Connelly, 479 U.S. 157, 167 (1986)). "'The question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" Plugh, 648 F.3d at 127 (quoting United States v. Spencer, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam) (internal quotation marks omitted).

B.     **Analysis**

As an initial matter, the Defendant's shifting account of what transpired on October 3, 2013, concerning Miranda warnings is not credible. Prior to the suppression hearing,

Cushnie submitted a declaration in which he stated, "I did not waive my Miranda rights[,] as evidence[d] by my refusal to sign the Miranda waiver." (Cushnie Decl. (Dkt. No. 15) ¶ 8)  The clear import of Cushnie's declaration is that he was shown the waiver form and asked to sign it, but refused do so.  At the suppression hearing, however, Cushnie testified on direct examination that officers never administered <u>Miranda</u> warnings or showed him a <u>Miranda</u> waiver form. (Hearing Tr. (Dkt. No. 31) at 87) (Q. "And do you recall an officer asking – reading to you a form regarding your Miranda rights?" A. "No, sir.")

On cross-examination, when the prosecutor began questioning Cushnie about the portion of his declaration in which he asserts that he refused to sign the <u>Miranda</u> waiver, Cushnie testified that he did not sign, or authorize his attorney to sign, the declaration that provided the evidentiary foundation for the suppression hearing.  (<u>Id.</u> at 91)

In his post-hearing briefing, Cushnie changes his position yet again.  In direct contradiction to his testimony at the hearing, Cushnie states that he "was presented with the [<u>Miranda</u>] form and was read the entire form, including the waiver portion of the form."  (<u>See</u> Def. Post-Hearing Reply Br. (Dkt. No. 35) at 1)  Cushnie goes on to argue that his refusal to sign the <u>Miranda</u> waiver form is proof that he did not waive his rights.  (<u>See id</u>. ("When presented with the form and asked to sign indicating his desire to waive his rights, the defendant affirmatively declined.  The only inference to be drawn in this case is that the defendant did not waive his rights."))

The Defendant's shifting and contradictory statements about the administration of <u>Miranda</u> warnings render his factual account not credible.  By contrast, Ricigliano and Romani consistently and credibly testified that (1) Ricigliano read the <u>Miranda</u> form to Cushnie in a "normal" or "conversational" tone; (2) Cushnie indicated that he understood his rights by

nodding and responding "yeah"; (3) Cushnie indicated that he was willing to answer questions by nodding and responding "yeah"; and (4) Cushnie refused to sign the waiver form.  (Hearing Tr. (Dkt. No. 1) 17-18, 53, 58)  Despite his refusal to sign the <u>Miranda</u> form, Cushnie proceeded to answer Ricigliano's questions.

Cushnie's refusal to sign the <u>Miranda</u> waiver form does not constitute an unambiguous invocation of his <u>Miranda</u> rights.  Here, as in <u>Berghuis</u> and <u>Plugh</u>, "it is undisputed that [Cushnie] did not expressly state that he wanted to remain silent or that he wanted to consult with an attorney." <u>Plugh</u>, 648 F.3d at 124; <u>see also Berghuis</u>, 560 U.S. at 375 ("At no point during the interrogation did [the suspect] say that he wanted to remain silent, that he did not want to talk with the police, or that he wanted an attorney.").  Moreover, as the <u>Plugh</u> court noted, "a refusal to <u>waive</u> rights, however unequivocal, is not necessarily equivalent to an unambiguous decision to <u>invoke</u> them." <u>Plugh</u>, 648 F.3d at 125 (emphasis in original).  This Court concludes that Cushnie did not unambiguously invoke his right to remain silent, and Inspector Ricigliano was therefore "under no obligation to cease all further questioning. . . ." <u>Id.</u> at 127.

To the extent that Cushnie argues that his refusal to sign the <u>Miranda</u> waiver form should be treated as conclusive evidence that he did not knowingly and voluntarily waive his <u>Miranda</u> rights (<u>see</u> Def. Post-Hearing Reply Br. (Dkt. No. 35) at 1), that argument is foreclosed by <u>Berghuis</u>.  In finding the defendant's custodial statements voluntary in that case – despite his refusal to sign the <u>Miranda</u> waiver form – the Court explained that

> [w]here the prosecution shows that a <u>Miranda</u> warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.

<u>Berghuis</u>, 560 U.S. at 384.

Here, the testimony at the suppression hearing established that (1) Inspector Ricigliano showed the Miranda waiver form to Cushnie and read it to him in a "conversational" tone; (2) Cushnie was familiar with Miranda warnings as a result of several prior encounters with law enforcement; (3) Cushnie told the marshals that he understood his rights and acknowledged that he was not obligated to speak with them; and (4) Cushnie was nonetheless willing to answer questions. (Hearing Tr. (Dkt. No. 31) 17-18, 53, 58, 88) Immediately thereafter Cushnie answered "no" when asked by Ricigliano whether the cell phone recovered from the apartment belonged to him. (Id. at 19) Two hours later, Cushnie answered additional questions while in the cell block at 500 Pearl Street. Although the marshals did not re-administer warnings to Cushnie at that time, "[p]olice are not required to rewarn suspects from time to time." Berghuis, 560 U.S. at 386. At no time did Cushnie indicate that he wished to stop talking with Ricigliano or that he wanted to consult with a lawyer. (Id.) Cushnie likewise does not claim that Ricigliano attempted to coerce him into making post-arrest statements, or that his will was overborne by the conditions of his confinement. Plugh, 648 F.3d at 128 ("[W]e have no reason to doubt the voluntariness of that waiver or the ensuing, inculpatory statements. Certainly [the defendant] does not claim that the officers threatened him or that he was intimidated in any way.").

In sum, this Court is "satisfied that 'with a full understanding of his . . . rights' [Cushnie] acted 'in a manner inconsistent with their exercise' when he chose to begin speaking with [Ricigliano] . . . , and, as such made a 'deliberate choice to relinquish the protections those rights afford.'" Id. (quoting Berghuis, 560 U.S. at 385). Accordingly, Cushnie's motion to suppress his post-arrest statements will be denied.

III.   **EVIDENCE SEIZED FROM APARTMENT 6J**

A.   **Legal Standards:  Warrantless Searches**

The Fourth Amendment guarantees that the people shall be "secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.

amend. IV.  A warrantless search is "per se unreasonable . . . subject only to a few specifically

established and well-delineated exceptions." United States v. Katz, 389 U.S. 347, 357 (1967).

To justify its warrantless seizure of Cushnie's keys, cell phone, wallet, and drugs, the

Government relies on the following exceptions to the Fourth Amendment's warrant requirement:

(1) search incident to a lawful arrest; (2) the plain view doctrine; and (3) voluntary consent to a

search by an authorized person.

1.   **Search Incident to a Lawful Arrest**

"Among the exceptions to the warrant requirement is a search incident to a lawful

arrest." Arizona v. Gant, 556 U.S. 332, 338 (2009).  "The exception derives from interests in

officer safety and evidence preservation that are typically implicated in arrest situations." Id.

"[P]olice may search incident to arrest only the space within an arrestee's '"immediate control,"'

meaning 'the area from within which he might gain possession of a weapon or destructible

evidence.'" Id. at 335 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)).

The Supreme Court explained the parameters of this exception in Chimel v.

California, 395 U.S. 752 (1969):

> When an arrest is made, it is reasonable for the arresting officer to search the
> person arrested in order to remove any weapons that the latter might seek to use in
> order to resist arrest or effect his escape.  Otherwise, the officer's safety might
> well be endangered, and the arrest itself frustrated.  In addition, it is entirely
> reasonable for the arresting officer to search for and seize any evidence on the
> arrestee's person in order to prevent its concealment or destruction.  And the area
> into which an arrestee might reach in order to grab a weapon or evidentiary items
> must, of course, be governed by a like rule. . . . There is ample justification,

therefore, for a search of the arrestee's person and the area 'within his immediate control' – construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

Id. at 762-63.

Several years later, in United States v. Robinson, 414 U.S. 218, 220 (1973), the Supreme Court addressed the search incident to arrest exception as it applies to containers found on or near the arrestee's person. In Robinson, officers discovered a crumpled up cigarette package in the defendant's shirt pocket following his arrest for a driving infraction. A search of the package revealed heroin. Id. at 223. The Court determined that such a search falls within the permissible scope of the search incident to arrest exception. Id. at 235 ("in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search"). In Robinson, the Court made clear that the applicability of this exception does not turn on the likelihood that evidence or a weapon will be recovered, but instead flows directly from the legitimacy of the underlying arrest:

> [t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.

Id., at 235.

In United States v. Chadwick, 433 U.S. 1 (1977) and Arizona v. Gant, 556 U.S. 332 (2009), however, the Supreme Court emphasized that this exception does not apply once a suspect no longer has access to the item or area at issue. In Chadwick, officers lawfully seized a 200-pound locked footlocker during the arrest of two suspected drug couriers, but did not search its contents until approximately ninety minutes later – "after federal agents had gained exclusive

control of the footlocker and long after [the arrestees] were securely in custody." Chadwick, 433 U.S. at 4-5, 14-15. The Supreme Court found that the search incident to arrest exception did not apply, concluding that "[o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." Id. at 15. The Court further noted that, "[u]nlike searches of the person . . . searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest." Id. at 16 n.10.

In Gant, after "Gant was arrested for driving with a suspended license, handcuffed, and locked in the back of a patrol car, police officers searched his car and discovered cocaine in the pocket of a jacket on the backseat." Gant, 556 U.S. at 335. In concluding that the cocaine was properly suppressed, the Supreme Court held that, with regard to the search of a car incident to a lawful arrest, the "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Gant, 556 U.S. at 351. The Court emphasized that "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications [under Chimel] for the search-incident-to-arrest exception are absent and the rule does not apply." Id. at 339. Accordingly, the Court concluded that arresting officers could not rely on the search incident to arrest exception to justify their warrantless search of an automobile's passenger compartment where the suspect was handcuffed and secured in the back of a locked patrol car. Id. at 335. The Court explained that its prior decisions "do[ ] not authorize a vehicle search

16

incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." Id.[6]

More recently, the Supreme Court has clarified that the search incident to arrest exception does not extend to a search of data on a lawfully seized cell phone. See Riley v. California, 134 S.Ct. 2473, 2485 (2014) ("officers must generally secure a warrant before conducting such a search"). Applying Chimel, the Riley court determined that the exception does not apply to such searches, in part because the data stored on cell phones does not implicate traditional officer safety concerns. Id. ("Digital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape."). The Court further noted that the Government's interest in preventing the destruction of evidence is considerably lessened once a cell phone has been secured. See id. at 2846 ("And once law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone.").

### 2.    Plain View Doctrine

"[L]aw enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." Kentucky v. King, 131 S. Ct. 1849, 1858 (2011). Specifically,

> [t]he "plain view" exception to the warrant requirement requires that: (1) the agents have lawful access to the place from which the item can be plainly viewed; (2) the objects seized are in plain view at the time they are discovered; and (3) it is "immediately apparent" to law enforcement at the time of the discovery that the item constitutes evidence or fruit of a crime.

United States v. Echevarria, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (citing Horton v. California, 496 U.S. 128, 136-37 (1990)). "The plain view doctrine applies to objects which are

---

[6] Neither the Supreme Court nor the Second Circuit has addressed whether Gant's holding applies outside the automobile context.

not in and of themselves contraband, so long as the incriminating nature of the object is readily apparent or the object is or contains evidence of a crime." United States v. Delva, 13 F.Supp.3d 269, 276 (S.D.N.Y. 2014).

### 3.      Voluntary Consent by an Authorized Person

A "search that is conducted pursuant to consent [from an authorized person]" constitutes another exception to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citing Davis v. United States, 328 U.S. 582, 593-94 (1946)). In order for consent to be effective, it must "not be coerced, by explicit or implicit means, by implied threat or covert force." Id. at 228. Accordingly, the Government must show by a preponderance of the evidence that the consent to search was voluntary. See United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006); United States v. Isofia, 370 F.3d 226, 230 (2d Cir. 2004).

### B.      Analysis

There is no dispute here that officers had probable cause to effectuate the arrest of Cushnie pursuant to a validly issued arrest warrant. Nor is there any dispute that Cushnie was arrested in the apartment's living room and that the items seized were "about two or three feet from" where he was located. (Hearing Tr. (Dkt. No. 31) at 15-16, 28) Given this proximity, the items seized fell within "the area from within which [Cushnie] might gain possession of a weapon or destructible evidence." Chimel, 395 U.S. at 763. Because the cell phone, keys, and wallet were "within [Cushnie's] immediate control," they were properly seized incident to his arrest. Id.; see also United States v. Meregildo, 2012 WL 4378047, at *3 (S.D.N.Y. 2012) (finding that "iPhone and iPod touch [located] on top of a dresser within three feet of [arrestee] . . . were within [his] immediate control and therefore properly seized incident to his arrest.") (citing Chimel, 395 U.S. at 763).

Cushnie argues that the search incident to arrest exception does not apply, however, because he was handcuffed, had been "placed on the ground," and was "surrounded by multiple law enforcement officers" when the items were seized.  (Def. Rep. Ltr. (Dkt. No. 40) at 3; Def. Ltr. (Dkt. No. 38) at 5-6)  Relying on Gant, Cushnie argues that "'if there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both [the officer safety and evidence preservation] justifications for the search-incident-to-arrest exception are absent and the rule does not apply.'"  (Def. Br. (Dkt. No. 33) at 8 (quoting Gant, 556 U.S. at 339)).

Assuming arguendo that Gant applies to searches outside the automobile context, that case does not require suppression of Cushnie's cell phone, keys, and wallet.  Unlike Cushnie, Gant "clearly was not within reaching distance of [the area searched]"; indeed, Gant was both handcuffed and placed in the back of a locked patrol car.  See Gant, 556 U.S. at 344. Accordingly, it was beyond question that Gant had no "possibility of access" to his automobile. Here, by contrast, the items seized were located only two or three feet away from Cushnie. Although Cushnie was handcuffed, and several officers were present in the living room where he had been detained, these facts do not demonstrate that there was no possibility that Cushnie could have reached his wallet, cell phone, or keys.  Indeed, courts interpreting Gant have upheld searches incident to arrest even where an arrestee is handcuffed or otherwise restrained by police.  See, e.g., United States v. Perdoma, 621 F.3d 745, 750 (8th Cir. 2010) (citing cases and noting that Gant does not hold that "an arrestee who is restrained in some fashion by law enforcement necessarily is secured").  In sum, even where an arrestee is restrained, the critical issue is whether the item in question remains in "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence."  Chimel, 395 U.S. at 763.

This analysis recognizes the reality that "handcuffs are not fail-safe." United States v. Shakir, 616 F.3d 315, 320 (3d Cir. 2010) (upholding search of the contents of defendant's bag pursuant to search incident to arrest exception where defendant was handcuffed and physically restrained by two policemen at the time of the search). As the Third and Fifth Circuits have noted,

> it is not true that "by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm. . . . Handcuffs are a temporary restraining device; they limit but do not eliminate a person's ability to perform various acts. They obviously do not impair a person's ability to use his legs and feet, whether to walk, run, or kick. Handcuffs do limit a person's ability to use his hands and arms, but the degree of the effectiveness of handcuffs in this role depends on a variety of factors, including the handcuffed person's size, strength, bone and joint structure, flexibility, and tolerance of pain. Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself. Finally, like any mechanical device, handcuffs can and do fail on occasion."

Id. at 320-21 (quoting United States v. Sanders, 994 F.3d 200, 209 (5th Cir. 1993)).

In sum, the fact that Cushnie was handcuffed and in the presence of several officers does not demonstrate that he had no ability to destroy or conceal evidence, or obtain a weapon, located two or three feet away. Assuming arguendo that Gant applies here, this Court concludes that "there remain[ed] a reasonable possibility that [Cushnie] could access a weapon or destructible evidence in the . . . area [within his immediate control]" – an area in which his cell phone, car keys, and wallet were found. Id. at 321. Accordingly, these items were properly seized incident to Cushnie's arrest.[7]

---

[7] The pills recovered from Cushnie's pants pocket were also the product of a lawful search incident to arrest. "The Second Circuit has long recognized that an arresting officer has a duty to ensure that an arrestee is sufficiently dressed before removing [him] from [his] residence." United States v. Rudaj, 390 F. Supp. 2d 395, 401 (S.D.N.Y. 2005) (citing United States v. Di Stefano, 555 F.2d 1094, 1101 (2d Cir. 1977)). Because Cushnie was not wearing pants at the time of his arrest (Hearing Tr. (Dkt. No. 31) at 15), it was appropriate for an officer to provide

Even if the search incident to arrest exception were not applicable, however, the cell phone, keys, and wallet were lawfully seized pursuant to the plain view exception to the warrant requirement.  Cushnie does not dispute the first two requirements under the plain view doctrine – i.e., that officers were lawfully present and that the items seized were in plain view. Cushnie argues, however, that the incriminating nature of the seized items was not "immediately apparent." (Def. Ltr. (Dkt. No. 38) at 7)  Cushnie contends that "there is nothing incriminating about a cell phone, wallet or car keys that is 'immediately apparent.'" (Id.)  "Ordinary, everyday objects such as cell phones, laptops, and cameras may take on a different character depending on the context in which they are found," however.  Delva, 13 F.Supp.3d at 276.

Under the plain view doctrine, "[f]or an item's criminal nature to be 'immediately apparent,' a reasonable agent must conclude that there is 'probable cause' to believe that the item constitutes evidence or fruit of a crime, without conducting some further search of the object." Echevarria, 692 F. Supp. 2d at 332; see also Delva, 13 F.Supp.3d at 276 ("[T]he incriminating nature of an object is generally deemed 'readily apparent' where law enforcement have reason to believe it is or contains evidence of a crime.") (citing United States v. Ochs, 595 F.2d 1247, 1258 (2d Cir.1979)).  "[T]he court is to consider whether probable cause exists from the perspective of a law enforcement officer." Echevarria, 692 F. Supp. 2d at 332.

Here, there are several reasons why the marshals had probable cause to believe that Cushnie's cell phone, car keys, and wallet would provide evidence of a crime – his failure to register as a sex offender.  Before Cushnie's arrest, the marshals had obtained a warrant that

---

him with pants.  This court has previously held that searching pants before providing them to an arrestee is "a proper search incident to arrest." Meregildo, 2012 WL 4378047, at *3. Accordingly, the search of Cushnie's pants pockets was entirely proper, and the drugs found as a result of that search were lawfully seized.

provided precise location information concerning what was believed to be Cushnie's cell phone. That location information indicated that Cushnie had left New York and was residing in Michigan, among other states. Accordingly, the marshals had reason to believe that Cushnie, a registered sex offender, had violated the registry requirements for sex offenders, and that his cell phone, car keys, and wallet would provide evidence of that fact. See 42 U.S.C. § 16913; 18 U.S.C. § 2250.

   Given Cushnie's proximity to the cell phone, car keys, and wallet at the time of his arrest, it was reasonable for the marshals to believe that these items belonged to Cushnie. Given the location information obtained through the warrant, it was likewise reasonable for the marshals to believe that the cell phone might contain evidence of Cushnie's registration violation.[8] Similarly, the car keys could lead to license-plate tracking information – and the wallet to credit cards or receipts – that could confirm Cushie's interstate movement. "It is not necessary that an officer know with certainty that an object seized is or contains evidence of a crime at the moment of seizure; it is enough that there be probable cause to associate the object with criminal activity." Delva, 13 F.Supp.3d 269, 276 (citing Texas v. Brown, 460 U.S. 730, 741–42 (1983)). In sum, the cell phone, car keys, and wallet were all properly seized pursuant to the plain view exception to the warrant requirement.

   Finally, this Court concludes that the warrantless seizure of drugs from Apartment 6J was proper given Manago's consent to search. "[W]hen, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." Snype, 441 F.3d at 131. Here, Ricigliano and

---

[8] This Court's conclusion that the cell phone was properly seized should not be read as validating any search of its contents. The Government has not suggested that it seeks to introduce evidence obtained from the contents of the Defendant's cell phone, and the parties have not briefed this issue.

Romani gave credible testimony that Manago – Cushnie's wife – gave verbal consent to the search of Apartment 6J.  (Hearing Tr. (Dkt. No. 31) at 54, 65, 61-63)  Their testimony on this point was corroborated by contemporaneous handwritten notes on the consent to search form. (Gov't Ex. 2)  Moreover, Manago was present while officers searched the apartment and did not object to the search (Hearing Tr. (Dkt. No. 31) at 25), and Cushnie himself acknowledges that Manago "told the police they could search the home to see if any other controlled substances were present." (Def. Br. (Dkt. No. 33) at 7).  Finally, Manago's refusal to sign the consent to search form is not persuasive evidence of her lack of consent, given testimony that – in connection with Cushnie's 2011 arrest – she refused to sign papers acknowledging her receipt of Cushnie's property.  (Hearing Tr. (Dkt. No. 31) at 7, 29, 33)

       Cushnie argues, however, that Manago's consent was not voluntary, due to "the early morning hour, the fact that she was upset, that she was detained in the apartment hallway in nightclothes, the language she used and the refusal to sign the [consent to search] form."  (Def. Br. (Dkt. No. 33) at 7)  Voluntary consent has been found in circumstances far more problematic that those present here, however.  See, e.g., United States v. Moreno, 701 F.3d 64, 76-78 (2d Cir. 2012) (finding no clear error in decision that consent was voluntary after "forcible entry into [defendant's] motel room by armed agents who both subdued and handcuffed her, failing thereafter to inform her that she was not required to consent")  Here, Manago was not subdued, was not handcuffed, and was not threatened with weapons.  (Hearing Tr. (Dkt. No. 31) at 56)

       While Manago testified that she "refused to sign the paper" and never gave consent to search (id. at 66), her testimony concerning her interaction with the marshals was contradictory.  For example, Manago initially testified that the marshals told her that she "didn't have to [give consent] if [she] didn't want to do that." (Id. at 67).  Manago later testified,

however, that she had never been advised of her right to refuse consent to search.  (Id. at 85)

Given the inconsistencies in Manago's testimony, this Court concludes that the marshals'

account is more credible.

### **CONCLUSION**

For the reasons stated above, the Defendant's motion to suppress his post-arrest

statements and evidence seized from Apartment 6J is denied.  The Clerk is directed to terminate

the motion (Dkt. No. 13).

Dated: New York, New York
      December 31, 2014

                                      SO ORDERED.

                                       Paul G. Gardephe
                                       United States District Judge